UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
POONITA BEEMSIGNE

                      Plaintiff,

               - against -

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                      Defendant.
-----------------------------------------------------------------X

<u>MEMORANDUM AND ORDER</u>
15-CV-4742 (RRM) (SMG)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Poonita Beemsigne commenced this action on August 13, 2015, alleging

employment discrimination and retaliation based on her sex, national original, and religion in

violation of Title VII of the Civil Rights Act of 1964, as amended 42. U.S.C. § 2003 *et seq.*, the

Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Title VII"), the New York State

Human Right Law ("NYSHRL") § 296, and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8–107, against defendant the New York City Department

of Education ("DOE").  (*See* Compl. (Doc. No. 1).)  The DOE now moves to dismiss the action

pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  (Def.'s Mem. (Doc. No. 21-2).)

For the reasons set forth below, the DOE's motion is granted.

# BACKGROUND

      Beemsigne, a Hindu woman of Asian-Guyanese descent, was hired by the DOE in

November 2001 as a substitute sixth grade teacher at I.S. 246 Walt Whitman Junior High School.

(Compl. ¶¶ 7–8.)  She was appointed as a full-time sixth grade teacher in January of 2002,

teaching all subject areas.  (*Id.* ¶ 9.)  Beemsigne received two Masters Degrees, in elementary

education and in leadership and technology, from Adelphi University in 2002 and 2004,

respectively. (*Id.* ¶ 10.) In 2005, she transferred to I.S. 229 Ronald Patterson School to participate in an internship to learn how to become a school administrator. (*Id.* ¶ 11.) That same year, Beemsigne became fully licensed to be a school administrator and received tenure. (*Id.* ¶ 12.) From 2005 to 2007, she worked as a staff developer for Region 5 schools assisting with technology-related issues. (*Id.* ¶ 13.) Beemsigne returned to the classroom in September 2007, as a teacher at J.H.S. 302 Rafael Cordero School, and subsequently took a position as a technology staff developer at IS. 230 Magnet School for Civics in the Community at the start of the 2008–2009 school year. (*Id.* ¶¶ 14–15.) During her time at I.S. 230, Beemsigne received satisfactory ratings, did not receive any write-ups, and had a good relationship with Principal Sharon Terry. (*Id.* ¶ 16.)

## I. Alleged Discrimination

In September 2012, Beemsigne went on childcare leave. (*Id.* ¶ 17) While Beemsigne was on leave, a new teacher assessment method, the Danielson Rubric, was implemented at I.S. 130. (*Id.* ¶¶ 22, 27.) In June 2014, while Beemsigne was still on leave, Terry left her position as Principal and was replaced by Ronald Zirin. (*Id.* ¶ 18.)

In August 2014, in anticipation of her return to work for the 2014–2015 school year, Beemsigne emailed Zirin requesting a meeting with him to discuss expectations for her position. (*Id.* ¶¶ 19–20.) During their meeting the following day, Zirin said to Beemsigne, "I didn't think you were going to come back." (*Id.* ¶ 20.) Around that same time, Beemsigne emailed Assistant Principal Barbara Newkirk to review the curriculum and to discuss expectations. (*Id.* ¶ 21.) Newkirk told Beemsigne that there was a New Teacher event scheduled for later that month, and that those topics would be covered at that event. (*Id.*)

On August 28, 2014, Beemsigne attended the New Teacher event. (*Id.* ¶ 22.) The topics covered did not pertain to social studies, the subject she would be teaching. (*Id.*) Additionally, no materials were distributed, no curriculum was provided, and there was no Danielson rubric training offered. (*Id.*) During the New Teacher event, Beemsigne asked Mr. Kringle, an "ELA teacher," for a lesson plan. (*Id.* ¶ 23.) Mr. Kringle provided a lesson plan to Newkirk who then provided it to Beemsigne. (*Id.*) The plan addressed first-day classroom procedures but did not contain substantive information pertaining to social studies. (*Id.*)

At the start of the 2014–2015 school year, Beemsigne learned that she would be teaching sixth grade social studies, including two inclusion classes, which included special education students, two English as a Second Language ("ESL") classes, and two regular education classes. (*Id.* ¶ 24.) Beemsigne is not licensed or certified to teach special education or ESL students. (*Id.*) Up to this point, neither Newkirk nor Zirin had provided Beemsigne with common core lesson plans, a social studies curriculum, materials and/or textbooks, or Danielson rubric training. (*Id.*) Beemsigne sought assistance from her colleagues in order to create lesson plans and a curriculum for her classes. (*Id.*) On September 14, 2014, Beemsigne emailed Newkirk with a question regarding a lesson planning framework. (*Id.* ¶ 25.) Newkirk responded to Beemsigne's email, but, in doing so, copied "the whole 6th grade team." (*Id.*) Beemsigne states that this action embarrassed her in front of her colleagues. (*Id.*)

Around this time, Beemsigne notified Zirin of her concerns regarding her perceived lack of support, including a lack of textbooks or a curriculum for her classes. (*Id.* ¶ 26.) Beemsigne alleges that similarly situated employees "outside of [her] protected class(es)" were offered support and materials, while she was not, and that they "were not embarrassed by their direct supervisors." (*Id.*) On October 1, 2014, Beemsigne received an official social studies

curriculum.  (*Id.* ¶ 27.)  Additionally, Zirin provided her with a 103 page document regarding the Danielson rubric.  (*Id.*)  However, Beemsigne was not provided training mechanisms or explanations on how to modify her lessons in order to fit within the rubric.  (*Id.*)  Beemsigne alleges that "[s]imilarly situated employees outside of her protected class(es) were properly trained in all eight Danielson Rubric domains," when she was not.  (*Id.*)  For example, Beemsigne alleges that Hannah Rosen, a white woman and new sixth grade social studies teacher, was trained in all eight Danielson Rubric domains.  (*Id.*)  On October 7, 2014, Beemsigne again emailed Zirin, noting that she had not received assistance with curriculum development, the Danielson Rubric, or incorporating ESL into her classroom.  (*Id.* ¶ 28.)

On October 15, 2014, Newkirk conducted an informal observation of Beemsigne's ESL class.  (*Id.* ¶ 29.)  Beemsigne received two ineffective ratings and two developing ratings.  (*Id.*)  Rosen, with whom Beemsigne alleges she is similarly situated, was told that teachers can only be observed during classes that they are licensed to teach.  (*Id.*)  On October 18, 2014, Beemsigne wrote Zirin an email expressing her frustration regarding her evaluation results and her desire for additional training.  (*Id.* ¶ 31.)  Beemsigne alleges that throughout the year she sought to be included in several training sessions, but was denied inclusion, despite the fact that similarly situated colleagues outside of her protected class were not similarly denied inclusion.  (*Id.*)  Zirin suggested that Beemsigne meet with Arline Cazes, a white woman and a teacher-mentor, who would provide additional, informal and non-evaluative support in working with her ESL students.  (*Id.* P 32.)  Newkirk clarified that Cazes would visit Beemsigne's classroom on an informal, non-evaluative basis and also would meet with her during her designated lesson preparation times.  (*Id.*)  Around the same time, Beemsigne met with Cazes to discuss her

frustrations.  Cazes allegedly said to Beemsigne, "you should consider another career or you should stay at home if you can afford it."  (*Id.*)

On October 24, 2014, Beemsigne met with Zirin and Newkirk to discuss her observation and her complaints regarding her lack of support.  (*Id.* ¶ 33.)  During the meeting, Beemsigne alleges that Zirin asked her in a derogatory manner, "[w]here did you come from?" and "[w]hat are you doing here?"  (*Id.*)  She further alleges that Zirin said, "I don't know anything about you!" and asked her, "[h]ow did you get this job?"  (*Id.*)  Beemsigne responded that, up until her October 15, 2014 observation, she had received satisfactory ratings throughout her tenure with the DOE.  (*Id.*)  Beemsigne claims that she reiterated in that meeting that she has gotten little to no support from the administration, including a lack of books, materials, and training.  (*Id.*)  At the end of the meeting, Zirin allegedly said to Beemsigne, "You should be happy if you get a developing rating this year, because you probably wouldn't get anything better."  (*Id.*)

On October 27, 2014, Zirin wrote Beemsigne a letter stating that he had arranged for her to visit and observe two social studies colleagues' lessons.  (*Id.* ¶ 34.)  Beemsigne alleges that one of these teachers, a white woman named Edyeli Marku, conducted her lesson in a manner similar to the way Beemsigne conducts her class, but Marku is rated a highly effective teacher and Beemsigne is not.  (*Id.*)  In general, Beemsigne alleges that Zirin displays favoritism and hires a "certain type" of teacher at the school, who all get highly effective ratings regardless of the substance of their lessons.  (*Id.* ¶ 30.)  Beemsigne alleges that Zirin prefers teachers who are young white females or Hispanic with a light complexion with blonde and brown hair, who are slender, and/or those who have large breasts.  (*Id.*)  Beemsigne alleges that Marku is one of the teachers who fits this description, along with Rosen and several others.  (*Id.*)  Beemsigne alleges that the teachers who match this description are given priority for per session jobs that earn them

extra money, are made teacher-mentors, and are predominantly selected to go on overnight school trips, which afford them additional income. (*Id.*)

On November 10, 2014, Beemsigne filled out an Annual Professional Performance Review ("APPR") complaint for her October 15, 2014 observation. (*Id.*) That same day, Beemsigne also filed a grievance for the lack of books for students. (*Id.*) On November 14, 2014, Zirin came to Beemsigne's classroom for an informal observation. (*Id.* ¶ 36.) Beemsigne alleges that she was successful in completing her lesson plan, but Zirin baselessly attacked her professionalism, and gave her ratings of "ineffective" and "developing" despite her performance. (*Id.*)

On November 17, 2014, Beemsigne had a grievance hearing regarding her October 15, 2014 observation. (*Id.* ¶ 37.) The District Representative, Barbara Mylite, determined that Beemsigne's performance and lesson warranted an effective rating. (*Id.*) However, on December 2, 2014, when Zirin gave Beemsigne a revised version of the observation report, she noticed that he had removed Mylite's comments that her performance was effective, and left the same ratings as the original observation. (*Id.*)

On November 25, 2014, during Beemsigne's free period, Beemsigne alleges she heard Zirin and Bibi Rahamatulla, another Assistant Principal and a woman of Guyanese descent, talking outside her classroom about getting rid of her. (*Id.* ¶ 38.) Zirin allegedly said to Rahamatulla, "[y]ou are her type of people. You should know how to get rid of her." (*Id.*)

On December 16, 2014, Beemsigne received an email from Zirin's secretary, Laura Shain, requesting a meeting. (*Id.* ¶ 40.) On December 18, 2014, Beemsigne and Shain met, and Shain asked Beemsigne to sign an observation report. (*Id.*) The observation report was from the informal observation that Zirin conducted on November 14, 2014. (*Id.*) Beemsigne, who had

not been provided of a copy of this report prior to being asked to sign it, was reluctant to comply. (*Id.*) Zirin then walked in, and Beemsigne told him that she had not yet received a copy of the observation to review. (*Id.*) Zirin acknowledged that she had not received a copy beforehand, but nonetheless required her to sign it. (*Id.*) When Beemsigne reiterated that she had a contractual right to review the report before she signed it, Zirin asked her if she was refusing to sign it, directed Shain to document Beemsigne's refusal, and threatened to put the report in Beemsigne's file showing she refused to sign. (*Id.*) Beemsigne, who allegedly felt intimidated by Zirin, signed the document. (*Id.*) This experience allegedly caused Beemsigne to experience severe anxiety and emotional distress, and led her to call out sick from work on December 19 to seek the care of a psychologist. (*Id.* ¶ 41.) Beemsigne obtained a doctor's note indicating that she would be unable to return to work until December 26, 2014. Due to the holiday break, she did not return until classes resumed on January 5, 2015. (*Id.*)

On December 30, 2014, Beemsigne sent a letter of intent to sue to the DOE, complaining of gender and national origin discrimination. (*Id.* ¶ 42.) On January 4, 2015, Beemsigne submitted an APPR form to Zirin regarding the signing of her November 14, 2014 observation. (*Id.* ¶ 43.)

## II. Alleged Retaliation

On January 5, 2015, when Beemsigne returned to work, she found that her effects and school–related materials were packed away in the corner of the classroom. (*Id.* ¶ 44.) Beemsigne had been scheduled to meet with Newkirk that day to discuss receiving additional support and assistance regarding her lessons and materials. (*Id.*) Beemsigne requested that she be allowed to organize her classroom before their meeting; Newkirk allegedly responded by

suggesting that Beemsigne did not want to meet and was not accepting the support that was offered her.  (*Id.*)

On January 14, 2015, Beemsigne was notified that she would be subject to a formal observation the following week.  (*Id.* ¶ 45.)   Given that she still had not completed training on the Danielson Rubric, Beemsigne requested that the observation be postponed.  (*Id.*)  Newkirk granted her request, rescheduling her formal observation to January 28, 2015.  (*Id.*)  On January 16, 2015, Beemsigne attended a training session, which covered three out of the eight domains of the Danielson Rubric.  (*Id.* ¶ 46.)  She was informed that the remainder of the material would be covered at an additional training session at a later date.  (*Id.*)  Beemsigne requested another postponement of her observation until such time as she had completed the training on the remaining components of the Danielson Rubric, but Zirin did not grant her request.  (*Id.*)  The same day, as Beemsigne was walking out of the school, Zirin allegedly said to her, "you will never win."  (*Id.* ¶ 47.)  Around the same time, Beemsigne asked to complete her Danielson training on the five remaining domains; she was not given the opportunity to do so.  (*Id.* ¶ 48.)  Beemsigne alleges that similarly situated employees who had not complained of discrimination were given Danielson Rubric training on multiple occasions.  (*Id.*)  Beemsigne further alleges that Zirin repeated his remark that she would "never win" on January 22, 2015, adding, "[w]hatever you say in this building will come back to me," and, "I didn't even know you had a lawsuit."  (*Id.* ¶ 49.)

On January 27, 2015, the APPR meeting took place for the November observation.  (*Id.* ¶ 50.)  Zirin modified the observation report, changing all the ineffective ratings to developing ratings and removing negative comments regarding Beemsigne's professionalism.  (*Id.*)  When explaining his reasons for changing the observation report, Zirin allegedly stated, "I'm not

changing it because of the lawsuit, but because you're being positive." (*Id.*)  The following day, Newkirk conducted a formal observation of one of Beemsigne's classes.  (*Id.* ¶ 51.)  Newkirk rated her with three effective and three developing ratings.  (*Id.*)

Between February and March 2015, on several occasions, Newkirk assigned Beemsigne to cover classes during her preparation periods, which hindered her preparation for lessons and prevented her from meeting with her teacher mentor, Cazes.  (*Id.* ¶ 52.)  On one such occasion, on March 13, 2015, Newkirk told Beemsigne that she needed to cover a gym class during her professional period.  (*Id.* ¶ 53.)  Beemsigne alleges that similarly situated employees who had not complained of discrimination were not assigned to cover classes during their professional periods.  (*Id.*)  While supervising the gym class, Beemsigne became lightheaded and dizzy, and leaned against a wall for support.  (*Id.* ¶ 54.)  Beemsigne alleges that Rahamatulla ordered her to keep walking around the gym, which she did, causing her to faint and remain unconscious for two to three minutes.  (*Id.*)  An ambulance was called, and Beemsigne was taken to the hospital.  (*Id.*)  She filed an injury report to the DOE later that day, which detailed the occurrence.  (*Id.*)

On or about March 19, 2015, Beemsigne filed a Notice of Claim with the Equal Employment Opportunity Commission.  (*Id.* ¶ 4.)  A letter providing notice of Beemsigne's right to sue was issued on May 18, 2015.  (*Id.*)

On March 16, 2015, Beemsigne submitted an application for excuse of absence for personal illness (sick days) for the days she took off following the fainting incident.  (*Id.* ¶ 55.)  On June 10, 2015, Beemsigne received a letter from Assistant Principal Vitale asking to meet with her on June 16, 2015 regarding an allegation that her injury report from March 13, 2015 was inaccurate.  (*Id.* ¶ 57.)  At the meeting, Beemsigne learned that Zirin had accused her of filing a false injury report and had asked for an investigation to be conducted into the matter.

(*Id.* ¶ 58.)  Similarly, Vitale accused Beemsigne of faking her fainting incident.  (*Id.*)  Beemsigne has yet to learn about the results of this investigation or to receive approval for her requested sick days.  (*Id.*)  Beemsigne asserts generally that "[s]imilarly situated employees who had not complained of discrimination were not accused of faking an injury or submitting a false injury report.  (*Id.*)

In April 2015, Beemsigne gave Newkirk documents that she created for instruction for her class that needed to be copied, and Newkirk said she would sign off on the copies.  (*Id.* ¶ 56.)  Having not received approval, Beemsigne later emailed Newkirk to ascertain the status, and Newkirk responded that she never received the documents.  (*Id.*)  Beemsigne alleges that Newkirk falsely responded in this manner so as to withhold classroom materials from Beemsigne and that "[s]imilarly situated employees who did not make a complaint of discrimination did not have classroom materials withheld or impeded."  (*Id.*)

In late June 2015, Beemsigne met with Newkirk for her end of the year meeting and to discuss her overall rating for the school year.  (*Id.* ¶ 59.)  Newkirk rated Poonita, who still had not been trained in the remaining Danielson rubric domains, "developing."  (*Id.*)

Based on the foregoing, Beemsigne alleges that the DOE discriminated against her based on her national origin, religion, and gender and subjected her to unlawful retaliation due to her complaints of discrimination in violation of Title VII of the Civil Rights Act of 1964.

## STANDARD OF REVIEW

At this stage, the Court assumes the truth of the facts alleged in the complaint, and draws all reasonable inferences in Beemsigne's favor.  *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).  The Court is not, however, "bound to accept as true a[ny] legal conclusion couched as a factual allegation."  *Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008) (quoting *Papasan v.*

*Allain*, 478 U.S. 265, 286 (1986)).  In order to withstand the DOE's motion to dismiss,

Beemsigne's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Hayden v. Paterson*, 594 F.3d 150,

160 (2d Cir. 2010).  Although the complaint need not contain "detailed factual allegations,"

simple "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also*

*Harris*, 572 F.3d at 72.  Rather, the complaint must include "enough facts to state a claim to

relief that is plausible on its face," *Twombly*, 550 U.S. at 570, which means "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

### DISCUSSION

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to

fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–

2(a); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015).

### I.    Discrimination

Discrimination claims based on disparate treatment brought under Title VII and the

NYSHRL are analyzed under the same standard.  *Johnson v. Long Island Univ.*, 58 F. Supp. 3d

211, 220 (E.D.N.Y. 2014).  Thus, the Court will analyze those claims together.[1]

---

[1] NYCHRL claims, on the other hand, must be reviewed separately as a more liberal analysis must be applied to such claims compared to their federal and state counterparts. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009); *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 436 (S.D.N.Y. 2015).  However, because, as discussed below, Beemsigne's federal claims are dismissed, the Court declines to exercise supplemental

Title VII employment discrimination claims are analyzed using the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), which first requires a plaintiff to establish a *prima facie* case of discrimination. *Johnson*, 58 F. Supp. 3d at 220. To establish a prima facie case of discrimination, a plaintiff must show that: (1) she is a member of a protected class, (2) she was qualified for the position she held, and (3) she suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *Vega*, 801 F.3d at 83. However, an employment discrimination claim need not allege specific facts to establish a *prima facie* case of discrimination under *McDonnell Douglas* to survive a motion to dismiss. *Id.*; *see also Johnson*, 58 F. Supp. 3d at 221 ("[A] complaint need not establish a prima facie case of employment discrimination to survive a motion to dismiss but the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim." (internal quotation marks and alterations omitted)). In other words, a plaintiff must plausibly allege that the employer took an adverse action against her and her protected status was a motivating factor in the employment decision. *Vega*, 801 F.3d at 86. The burden at this stage is "minimal." *Id.* at 85.

Here, the DOE does not dispute that Beemsigne is a member of a protected class who was qualified for the position she held. (Def.'s Mem. at 17.) Instead, the DOE contends that Beemsigne has not plausibly alleged acts sufficient to constitute an adverse employment action or facts sufficient to create a minimal inference of discriminatory animus. (*Id.*)

---

jurisdiction over her NYCHRL claims at this time. *See Lioi v. N.Y.C. Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 594 (S.D.N.Y. 2012) ("Both the Second Circuit and the Supreme Court have held that, as a general rule, when the federal claims are dismissed the state claims should be dismissed as well." (internal quotation marks omitted)).

### a.     Adverse Employment Actions

An adverse employment action exists if a plaintiff endures a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted); *see also Glover v. Federation of Multicultural Programs*, No. 14-CV-4006 (KAM) (LB), 2015 WL 4600645, at *9 (E.D.N.Y. July 29, 2015), *adopting report and recommendation*.  A materially adverse change does not require an economic loss, but it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Glover*, 2015 WL 4600645, at *9 (quoting *Sanders v. N.Y.C. Human Res. Admin*, 361 F.3d 749, 755 (2d Cir. 2004)).  It can include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya*, 202 F.3d at 640 (internal quotation marks omitted, alteration in original).  "[E]veryday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions within the meaning of Title VII." *Cunningham v. N.Y.S. Dep't of Labor*, 326 F. App'x 617, 619 (2d Cir. 2009) (summary order).

Here, Beemsigne alleges that she was denied training on the Danielson rubric, which was "essential for her to properly perform her job"; in the 2014 through 2015 school year, she was assigned to teach two ESL classes and two inclusion classes, which included special education students, despite not being licensed or certified to teach special education or ESL students; she was assigned to cover classes during her preparation period, depriving her of time needed to prepare her lessons and meet with her mentor; and she received negative evaluations and teachers with highly effective ratings were given priority for per session jobs, which provide

extra income, are made teacher mentors, and are predominantly selected for overnight school trips, which also afford additional income. (*See* Compl. ¶¶ 24, 27, 30, 52; Pl.'s Mem. at 10–15.)

In certain circumstances these types of actions may provide a sufficient basis for finding an adverse employment action occurred. A denial of training can constitute an adverse employment action, but it must bear on a plaintiff's opportunities for professional growth or advancement or directly on her compensation. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006). A change in duties or a job reassignment may constitute an adverse employment action if it is so significant as to constitute a setback to the plaintiff's career. *See Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013); *see also Galabya*, 202 F.3d at 641 (stating that, "[t]he key . . . is that the plaintiff must show that the transfer created a materially significant disadvantage"). Similarly, for a disproportionately heavy workload to constitute an adverse employment action, a plaintiff must show that it created a materially significant disadvantage with regard to opportunities for professional growth and career advancement. *See Edwards*, 957 F. Supp. 2d at 211. Moreover, "[w]here assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments does not, without more, rise to the level of an adverse employment action." *Johnson*, 58 F. Supp. 3d at 224. Finally, negative evaluations, written reprimands, and disciplinary meetings do not constitute adverse employment actions "absent some accompanying adverse result such as demotion, diminution of wages, or other tangible loss." *Browne v. City Univ. of N.Y.*, 419 F. Supp. 2d 315, 332 (E.D.N.Y. 2005) (collecting cases), *aff'd*, 202 F. App'x 523 (2d Cir. 2006); *see also Giscombe v. N.Y.C. Dep't of Educ.*, No. 12-CV-464 (LTS), 2013 WL 829127, at *5 (S.D.N.Y. Feb. 28, 2013) ("The Complaint does not identify any materially adverse changes in Plaintiff's employment resulting from . . . unspecified 'disciplining' . . . or from his

Unsatisfactory rating."); *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582 (JG), 2012 WL 5989874, at *7 (E.D.N.Y. Nov. 30, 2012) (finding that negative performance evaluations only constitute an adverse employment action if they "trigger negative consequences to the conditions of employment").

Beemsigne does not allege that her career suffered in any tangible way as a result of these acts. She does not allege that her salary or benefits were impacted, but only that teachers who received effective ratings "are given priority for per session jobs that earns them extra money, are made teacher-mentors, and are predominantly selected to go on overnight school trips, which afford them additional income." (Compl. ¶ 30.) She does not allege that she ever sought or was denied such opportunities. This is insufficient to plausibly allege a materially adverse change in the terms and conditions of her employment. Accordingly, Beemsigne's disparate impact claims under Title VII and the NYSHRL are dismissed.[2]

## II.    Retaliation

"In order for a retaliation claim to survive a motion to dismiss, 'the plaintiff must plausibly allege that: (1) defendants discriminated – or took an adverse employment action –

---

[2] Because Beemsigne has failed to sufficiently plead an adverse employment action, the Court need not reach the issue of whether she has sufficiently pled an inference of discrimination. However, the Court notes that Beemsigne has failed to create an inference of discrimination through comparators Rosen and Marku with respect to her claims regarding lack of training and negative evaluations as she has failed to allege facts that demonstrate that Rosen and Marku were similarly situated. (*See* Compl. ¶¶ 27, 29, 30, 34.) Further, she has failed to allege facts giving rise to an inference of discrimination with respect to her assignment to teach ESL and special education students. She has not alleged even generally that other similarly situated teachers outside of her protected class were not required to teach classes that they were not licensed or certified to teach. She alleges only that a similarly situated teacher was "told that she can only be observed during classes that she is licensed to teach." (*Id.* ¶ 29.) Finally, to the extent Beemsigne attempts to rely on "gender plus" discrimination, her reliance is misplaced because she does not set forth any facts indicating that she was discriminated against compared to male counterparts. *See Marks v. Nat'l Commc'n Ass'n, Inc.*, 72 F. Supp. 2d 322, 332 (S.D.N.Y. 1999) ("[T]he viability of [plaintiff's] theory of 'gender plus' discrimination hinges on her ability to show that [defendant] refused to hire overweight women, like herself, as sales representatives, but had no such restriction on hiring overweight men."); *see also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 290 (2d Cir. 1998) ("[T]his Court has upheld the dismissal of a Title VII complaint for failure to state a claim where a female employee alleged gender discrimination on the basis that the promotions she sought were given to more attractive women, but did not allege that men were not also subject to attractiveness criteria in determining promotions and did not allege that she had ever been in competition with a male." (citing *Malarkey v. Texaco, Inc.*, 704 F.2d 674, 674–75 (2d Cir. 1983) (per curiam))).

against [her], (2) because [s]he has opposed an unlawful employment practice.'" *Lopez v. City of New York*, No. 14-CV-3285 (NGG), 2016 WL 3129184, at *4 (E.D.N.Y. June 2, 2016) (quoting *Vega*, 801 F.3d at 90). The second prong of this standard requires a plaintiff to plausibly allege that the retaliation was a "but-for" cause of the complained of action. *Id.* (citing *Vega*, 801 F.3d at 90–91).

### a.    Adverse Employment Action

"The standard for an adverse employment action in retaliation claims is considerably broader than the standard for discrimination claims under Title VII." *Taylor*, 2012 WL 5989874, at *9 (internal quotation marks omitted). While a discrimination claim must demonstrate adverse actions affecting the terms and conditions of employment, a retaliation claim may be based on "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and employers." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).

Here, Beemsigne alleges that after she filed her intent to sue letter with the DOE, her employer retaliated with conduct similar to that discussed above relating to Beemsigne's discrimination claims – by denying her training, giving her a disproportionately heavy workload, and giving her negative evaluations. (*See* Pl.'s Mem. at 28.) While these allegations did not rise to the level of an adverse employment action under the more limited standard for discrimination, they may be sufficient to meet the broader standard in the retaliation context. *See Taylor*, 2012 WL 5989874, at *10 ("The courts in this Circuit have held that 'negative performance reviews, standing alone, can be considered an adverse employment action' for purposes of a retaliation claim." (quoting *Siddiqi v. N.Y.C. Health & Hosp. Corp.*, 572 F. Supp. 2d 353, 363 (S.D.N.Y. 2008))); *Hill*, 467 F. Supp. 2d at 363 (noting that the "assignment to arduous tasks, even without

a change of job title, is one type of adverse action that could deter Title VII protected activity"). Beemsigne also alleges that she was retaliated against when Zirin accused her of making a false injury report after she filed her complaint. (Pl.'s Mem.; *see also* Compl. ¶ 58.) This too could rise to the level of an adverse action under the more lenient retaliation standard. However, as discussed below, Beemsigne has failed to allege a nexus between these actions and her protected activity.

### b. Inference of Discrimination

In order to sufficiently plead a retaliation claim, a plaintiff must plausibly allege that "the retaliation was the 'but-for' cause of the employer's adverse action" to demonstrate that "the adverse action would not have occurred in the absence of the retaliatory motive." *Vega*, 801 F.3d at 90–91. A plaintiff may demonstrate an inference of discrimination by showing "that the protected activity was followed closely by discriminatory treatment" or "through other evidence such as disparate treatment of fellow employees who are engaged in similar conduct." *Borrero v. Collins Bldg. Srvs., Inc.*, No. 01-CV-6885 (AGS), 2002 WL 31415511, at *15 (S.D.N.Y. Oct. 25, 2002). Here, Beemsigne argues she has sufficiently alleged a causal nexus between her complaint and the alleged retaliatory conduct by pleading facts showing a close temporal proximity and that she was treated less well than similarly situated employees. (Pl.'s Mem. at 29.)

As a preliminary matter, the allegations regarding failure to train, a heavy workload, and negative evaluations are no more than a continuation of the conduct Beemsigne alleges began well before she submitted her letter of intent to sue. (*See* Compl. ¶¶ 44, 48, 51–53, 56, 59.) As such, no inference of retaliation can arise from this conduct. *See Nicastro v. N.Y.C. Dep't of Design & Constr.*, 125 F. App'x 357, 358 (2d Cir. 2005) (summary order) ("[W]here timing is

the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)); *Young v. Westchester Cnty. Dep't of Social Servs.*, 57 F. App'x 492, 495 (2d Cir. 2003) (summary order) ("[W]here the adverse action was already ongoing at the time of the protected activity, or is very similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation."); *Lopez*, 2016 WL 3129184, at *8 ("It is well established that retaliation cannot precede protected activity."); *Chung*, 2014 WL 11462811, at *4 (finding that "Plaintiff's alleged protected activity cannot be the but-for cause of actions that were already allegedly being taken against Plaintiff before he engaged in the protected activity" where plaintiff complained "predominantly of diminished responsibilities, 'marginalized daily tasks,' denial of access to trainings, and assignments lost to student employees").

Additionally, with respect to her claim that Zirin accused her of falsely reporting an injury in retaliation for her complaint, Beemsigne has failed to plead facts demonstrating a temporal proximity or similarly situated employees that would create an inference of retaliation. Beemsigne alleges that she filed her letter of intent to sue, based on gender and national origin discrimination, with the DOE on December 30, 2014. (Compl. ¶ 42.) On January 16, 2015 Zirin allegedly told her, "you will never win." (*Id.* ¶ 47.) On January 22, 2015, Zirin again told her she would "never win," and further said, "whatever you say in this building will come back to me" and "I didn't even know you had a lawsuit." (*Id.* ¶ 49.) These comments suggest that Zirin was aware of Beemsigne's complaint at least as of January 16, 2015. On January 27, 2015, Zirin met with Beemsigne and made changes to Beemsigne's November observation report in her

favor, changing one of her ratings from ineffective to developing and removing negative

comments regarding her professionalism from an observation report.  (*Id.* ¶ 50.)  Zirin noted that

he was "not changing it because of the lawsuit, but because [Beemsigne was] being positive."

(*Id.*)  The injury underlying the alleged retaliatory action occurred on March 13, 2015, at which

time Beemsigne filed an injury report.  (*Id.* ¶¶ 53–54.)  On June 16, 2016 – at least six months

after Zirin learned of Beemsigne's complaint – Zirin accused Beemsigne of filing a false report.

(*Id.* ¶ 58.)  On these facts, there is nothing to tie the alleged adverse action of accusing

Beemsigne of filing a false report to her filing of the complaint or Zirin's distant comments

regarding the complaint.  The complaint and the alleged adverse conduct were not close in time,

occurring six months apart.[3]  *See Riddle v. Citigroup*, 640 F. App'x 77, 79 (2d Cir. 2016)

(summary order) (noting that "the Supreme Court has suggested that 'the temporal proximity

must be 'very close''" (quoting *Clark Cnty Sch. Dist. v. Breeden*, 532 U.S. 268 273 (2001))); *see*

*also Lopez*, 2016 WL 3129184, at *9 ("[C]ourts in this circuit have consistently held that a time

period of more than two months between protected activity and the adverse employment action

does not allow for an inference of causation." (collecting cases)).  Further, Beemsigne's

conclusory statement that "[s]imilarly situated employees who had not complained of

discrimination were not accused of faking an injury or submitting a false injury report" (Compl.

¶ 58), is wholly inadequate to sustain a claim of a causal nexus through a comparator.  *See*

*Rankel v. Town of Somers*, 999 F. Supp. 2d 527 (S.D.N.Y. 2014) (dismissing claim where

plaintiff provided "no information . . . that would support the conclusory statement that

[individuals] were similarly . . . situated); *Dellutri v. Vill. Of Elmsford*, 895 F. Supp. 2d 555, 572

---

[3] Beemsigne argues that the opportunity to retaliate arose when Beemsigne submitted the injury report and the retaliatory conduct occurred only three months after that.  (Pl.'s Mem. at 31.)  While the Court is skeptical that this is the relevant time frame, it notes that, where, as here, there is little more than temporal proximity alleged to demonstrate an inference of discrimination, three months is also not "very close" in time.

(S.D.N.Y. 2012) ("Because this conclusory statement offers no details regarding other similarly situated individuals, this claim is dismissed." (collecting cases)); *see also Iqbal*, 556 U.S. at 678 ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Beemsigne alleges no facts stating in what way these alleged comparators were similarly situated. For example, she does not indicate that any other employee who had not complained of discrimination filed an injury report. Accordingly, Beemsigne's retaliation claim is dismissed.

## III.    Hostile Work Environment

Beemsigne also brings a hostile work environment claim. "A hostile work environment arises when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Johnson*, 58 F. Supp. 3d at 225 (internal quotation marks omitted). To state a claim for hostile work environment,

> a plaintiff must plead facts that would tend to show that the complained of conduct: (1) "is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's [protected characteristic]."

*Patane v. Clark*, 508 F. 3d 106, 113 (2d Cir. 2007) (ellipsis in original) (quoting *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001). The work environment's hostility "should be assessed based on the 'totality of the circumstances.'" *Id.* (quoting *Harris v. Forkllift Sys., Inc.*, 510 U.S. 17, 23 (1993)). In making this assessment, the Court might consider "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Id.*; *see also Johnson*, 58 F. Supp. 3d at 225. In short, a plaintiff must plead facts

"sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Patane*, 508 F.3d at 113 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)). "Ordinarily, sporadic derogatory comments concerning a protected class will not support a hostile environment claim." *Nakis v. Potter*, No. 01-CV-10047 (HBP) 2004 WL 2903718, at *23 (S.D.N.Y. Dec. 15, 2004).

Beemsigne's allegations do not give rise to an objectively hostile work environment. Beemsigne bases her hostile work environment claim on being assigned a heavier workload and limited resources, being subjected to higher standards than her co-workers, having the entire sixth grade team copied on an email from Newkirk to Beemsigne in an effort to embarrass Beemsigne, and on remarks made by Zirin on two occasions – one on October 24, 2014 and the other on November 25, 2014. (Pl.'s Mem. at 25–26.) None of these acts constitute the "grossly abusive conduct that has been found in other cases to satisfy the objective element of a hostile-environment claim." *Nakis*, 2004 WL 2903718, at *26 (finding that a denial of resources required for plaintiff's job, a refusal to correct leave errors in personnel action forms affecting plaintiff's salary and benefits, and denial of an opportunity to attend training, among other allegations, did "not even approach the grossly abusive conduct that has been found in other cases to satisfy the objective element of a hostile-environment claim"); *see also Alfano v. Costello*, 294 F.3d 365, 379–80 (2d Cir. 2002) (comparing dozens of cases where conduct has been found insufficient to constitute a hostile work environment with those where conduct was sufficient); *Ulrich v. Moody's Corp.*, No. 13-CV-0008 (VSB), 2014 WL 4977562, at *12 (S.D.N.Y. Sept. 30, 2014) (finding plaintiff's claim that, among other things, he was not

permitted to write under his own name like his colleagues and that he was subjected to harsher discipline than his colleagues insufficient to state a hostile work environment claim).

## CONCLUSION

For the reasons set forth above, the DOE's Motion to Dismiss is granted. The Clerk of Court is directed to enter judgment accordingly, and close the case.

SO ORDERED.

Dated: Brooklyn, New York
      March 8, 2017

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge